**AFFIDAVIT OF SPECIAL AGENT TIMOTHY R. KENNY IN SUPPORT OF
AN APPLICATION FOR A SEARCH WARRANT**

I, Timothy R. Kenny, state:

### INTRODUCTION

1.  I am an investigative or law enforcement officer of the United States, within the meaning of 18 U.S.C. §2510(7), and am empowered by law to conduct investigations of and to make arrests for offenses enumerated in 18 U.S.C. §2516. I have been a Special Agent with the Federal Bureau of Investigation since 2014. For much of that time, I have been engaged in gang and drug investigations. I was previously employed as an Assistant District Attorney with the Plymouth County District Attorney's Office in Massachusetts 2008 through 2014. I am currently assigned to the Federal Bureau of Investigation, Boston Office. Based on my training and experience as an FBI Special Agent, I am familiar with federal narcotics laws. In this regard, I know that it is a violation of 21 U.S.C. §§841(a)(1) and 846 to conspire to distribute, and to distribute, controlled substances, including fentanyl.

2.  In the course of participating in investigations of drug trafficking, I have conducted or participated in surveillance, the purchase of illegal drugs, the execution of search warrants, debriefings of subjects, witnesses, and informants, and reviews of consensually recorded conversations and meetings. I have also received training through my position as a FBI Special Agent involving narcotics trafficking. Through my training, education, and experience, I have become familiar with the manner in which drug traffickers conduct their illegal drug trafficking activities, including their use of cellular telephones to contact drug customers, co-conspirators and associates, and sources of illegal drug supply. I am also familiar with drug traffickers' methods of operation, including distribution, storage, and transportation of narcotics.

3. I am currently investigating Dylan Fontes for violations of the federal firearm and drug laws, 18 U.S.C. §§922(g)(1), 924(c) and 21 U.S.C. §§841(a)(1), 846.[1]

4. This affidavit is being submitted in support of an application for a warrant to search electronic equipment:

a) one black Apple iPhone X, IMEI: 354853093235525 (Target Telephone 1);

b) one black Sanyo PRO-700 flip phone (Target Telephone 2);

c) one silver Apple iPhone, Model: A1549, IMEI: 359233060415415 (Target Telephone 3);

d) one gold Apple iPhone 6s, Model A1688, FCC ID: BCG-E2946A (Target Telephone 4);

e) one black LG phone, Model: LG-VS880PP, IMEI: 353177073844879 (Target Telephone 5); and

f) one Motorola Liberty Mobile flip phone, FCC ID: IHDT56LQ1 (Target Telephone 6)

(collectively, the "equipment"). These items to be searched are further described in Attachment A. There is probable cause to believe that the equipment contains evidence, fruits, and instrumentalities of the crimes listed above, as described in Attachment B.

5. The facts in this affidavit come from my personal observations and review of records, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested search warrant and does not set forth all of my knowledge about this matter.

---

[1] A review of Fontes' criminal record revealed that he had a prior conviction out of the Brockton District Court on the charge of Assault and Battery with a Dangerous Weapon on which he was convicted on September 16, 2016.

2

## BACKGROUND OF OPERATION LANDSHARK

6.     Operation Landshark is an investigation that identified impact players and repeat offenders in Brockton and Boston.   These individuals were targeted utilizing controlled purchases of drugs and firearms using cooperating witnesses ("CWs").   Each defendant has sustained convictions for acts of violence, firearm offenses, and/or drug trafficking.   Operation Landshark targeted these defendants because their removal from the streets of Brockton and Boston will result in a significant reduction of the crime rate.   Law enforcement believes that many of Operation Landshark's targets are in the top thirty criminal offenders responsible for violent acts and firearm offenses in Brockton.   Because of their seasoned experience with law enforcement, most of the targets have insulated themselves from street-level drug deals.   Instead, the targets supply street-level drug dealers with narcotics.   Many of the offenders are household names to police, informants, and the community.   These high-profile targets are sophisticated enough to avoid committing violent acts themselves.   Rather, they use the power generated from their reputation and street credibility to direct the younger generation to commit acts of violence against drug dealers competing in the market or infringing on their territory.

7.     Given the targets' insulation from easily-detected criminal activity, traditional law enforcement methods were ineffective to build solid cases against many of them.   As a result, Operation Landshark utilized two trusted associates as CWs, who have long histories with these impact players, to conduct controlled buys of drugs and firearms.[2]

---

[2] CW-1 began cooperating with law enforcement in February 2018.   CW-1 has positively identified numerous individuals involved in drug trafficking, illegal firearms possession, and gang activity.   CW-1 has conducted numerous consensually recorded conversations with target subjects in person and over the telephone.   CW-1 has made numerous controlled purchases of drug and firearms evidence from target subjects.   CW-1 has provided information regarding individuals involved in drug trafficking that has led to the arrest of those individuals and the seizure of drugs. The information provided by CW-1 has been corroborated by the controlled purchases, the arrests, and by the investigation generally.   CW-1's criminal history includes convictions for disturbing the peace, assault

3

8.      Several of Operation Landshark's targets are impact players who have continuously committed violent acts and firearm offenses. There are also several younger targets who have been identified as impact players in Brockton. These younger targets have also demonstrated a proclivity for violence. In addition, Operation Landshark targeted additional impact players in Boston from whom the CWs were able to make controlled purchases of contraband.

## FACTS

### Probable Cause to Believe That a Federal Crime Was Committed

9.      The Federal Bureau of Investigation initiated an investigation in July 2018 concerning the drug trafficking activity of Dylan Fontes.

10.     On July 9, 2018, at approximately 2:45 pm, CW-1 called "Jay"[3] at telephone number 860-801-3903 ("a Fontes phone"). Fontes asked CW-1 what CW-1 wanted to buy. CW-1 asked for $100 of crack cocaine and $100 of fentanyl. Fontes told CW-1 that he did not have "hard" (crack cocaine) and only had "soft" (cocaine powder). Fontes told CW-1 he would be ready in fifteen minutes to complete the deal. Fontes did not answer subsequent calls on July 9, 2018. Fontes later told CW-1 that he had left his phone in his car and did not receive the calls.

11.     On or about July 24, 2018, at approximately 1:21 pm, CW-1 called Fontes on a Fontes phone. Fontes agreed to sell CW-1 $100 of fentanyl. Fontes told CW-1 he would meet CW-1 on the south side of Brockton. At approximately 2:26 pm, Fontes used a Fontes phone to

---

and battery, resisting arrest, disorderly conduct, leaving the scene of personal injury, trafficking cocaine, and conspiracy to violate the controlled substance act. CW-1 has admitted to substance abuse in the past. CW-1 has received consideration in the form of financial assistance and consideration on potential criminal charges in connection with his/her cooperation.

[3] On July 31, 2018, following the controlled purchase of evidence described above, law enforcement officers administered a sanitized eight-pack photo array to CW-1. CW-1 identified photo number 6 as "Jay," from whom CW-1 bought fentanyl. Photo number 6 was a photo of Dylan Fontes, xx/xx/1992.

call CW-1. CW-1 did not answer. At approximately 2:28 pm, CW-1 called Fontes back on a Fontes phone. Fontes told CW-1 to meet him on Jackson Street near Perkins Avenue in Brockton, Massachusetts ("MA")[4] to complete the deal.

12. At approximately 2:43 pm, while under the surveillance of law enforcement officers, CW-1 went to the area of Jackson Street off Perkins Avenue in Brockton, MA.[5] Law enforcement officers observed a silver Chevrolet SUV, bearing MA license plate 6EL629, traveling on Concord Street towards Perkins Avenue. The Chevrolet SUV turned right onto Perkins Avenue and right onto Jackson Street. According to Hertz rental company, MA 6EL629 is registered to a gray 2018 Chevrolet Equinox. Fontes rented the vehicle on July 23, 2018. I know, based on my training and experience, that drug traffickers often utilize rental vehicles in their drug trafficking activity and frequently change their rental vehicles in order to insulate their identities and frustrate investigations of law enforcement officers.

13. Moments later, CW-1 received an incoming call from Fontes on a Fontes phone. Fontes told CW-1 to pull onto the side street. CW-1 drove onto Sansom Street. The Chevrolet SUV then arrived on Sansom Street. Fontes motioned to CW-1 for CW-1 to get into the Chevrolet SUV. CW-1 entered the front passenger seat of the Chevrolet SUV. Fontes handed CW-1 a clear plastic bag containing a white powder substance. Fontes told CW-1 he charges $100 for "a quarter" or 2.5 grams. CW-1 handed Fontes $100 in OAF. Fontes told CW-1 that if CW-1 would buy a larger quantity, Fontes will improve the price. I know, based on my training and

---

[4] During this and prior investigations, law enforcement has identified Fontes as a member of the Perkins Avenue street gang in Brockton, MA.

[5] Prior to meeting with Fontes, law enforcement searched CW-1 for money and contraband, with negative results, provided CW-1 $200 in Official Agency Funds ("OAF") for the purchase, and equipped CW-1 with a recorder and transmitter.

experience, that drug traffickers often provide new drug customers with small amounts of drugs so that the drug customer can test the quality of the drug before purchasing a larger quantity. Further, I know that drug traffickers often offer better prices per unit of drug if a drug customer purchases a larger quantity of drugs. Selling larger quantities of drugs allows drug traffickers to more quickly disperse their drugs, limiting their exposure to law enforcement when they are in possession of the drugs and allowing them to obtain a new drug supply more quickly. CW-1 exited the Chevrolet SUV and left the area. Fontes departed the area in the Chevrolet SUV.

14. CW-1 proceeded directly to a predetermined location as directed by the surveillance agents. Once back at the predetermined location, CW-1 turned over one clear plastic bag containing a white powder substance. The substance was sent to the DEA New England Field Division laboratory for further analysis, which revealed the substance contained fentanyl and weighed 1.9588 grams.

15. I debriefed CW-1 regarding the details of the buy, and I have reviewed all available audio and video recordings of the transaction following the purchase of fentanyl. The recording corroborates CW-1's account of the interaction with Fontes. The video taken during the controlled buy shows Fontes. I am familiar with the appearance of Fontes from his license photograph and was able to identify him.

### Investigators' Possession of the Equipment

16. The equipment is currently in the possession of the FBI, and is being stored at its facilities, as described in Attachment A. Investigators obtained the equipment in the following way:

17. On August 15, 2018, Dylan Fontes was named in an indictment in <u>United States v. Dylan Fontes,</u> Criminal No. 18-10263-GAO, and charged with Distribution of Fentanyl. On that

same day, a warrant was issued for Fontes' arrest. Intelligence obtained in anticipation of this arrest indicated that Fontes was staying at 13 Bay Drive, Canton, MA. On August 17, 2018 this Court issued a search warrant (18-mj-4341-DHH) for "information about the location of the phone assigned 860-801-3903" (a Fontes phone). Historical data and GPS ping location obtained pursuant to the warrant indicates that between August 2, 2018 and August 23, 2018 the phone's most frequently used tower/sector was the tower/sector that provides cellular coverage to 13 Bay Drive. Additionally, throughout the period during which cell site information and prospective GPS information was obtained, the phone was located at, or in the immediate vicinity of, 13 Bay Drive at nighttime.

18.  On August 21, 2018, at approximately 7:30 a.m., your affiant observed a blue Ford F-150, Connecticut license plate C118906, in the driveway of 13 Bay Drive, Canton, MA (Pyrnnes Hill Apartments). At approximately 2:40 p.m., surveillance officers observed Dylan Fontes departing from the apartment complex in the blue Ford F-150. At approximately 3:00 p.m., surveillance officers again observed the blue Ford F-150 parked near 13 Bay Drive.

19.  On August 23, 2018, at approximately 4:00 a.m., a number of law enforcement officers arrived at 13 Bay Drive, Canton, MA to effect the arrest warrant. The officers arrived and observed an individual identified as Dylan Fontes in a window. Fontes left the window of that room and was identified moments later by the officers in the window of a second room, later identified as the bathroom—which is located on the same side of the building. Fontes appeared to open the blinds and window, and then shut the window and blinds. The officers then observed the light in that room turn off.

20.  The officers then made entry to arrest Fontes on the arrest warrant. Fontes was arrested in the second-floor, rear bedroom of 13 Bay Drive. The second-floor, rear bedroom is

connected to the bathroom where law enforcement had observed Fontes through the second window. Fontes was wearing only nylon shorts. Another person, Keith Lobo, was present in the second floor, front bedroom.[6] The officers looked in the toilet tank right beneath the window in which the officers had observed Fontes just prior to their entry and observed a firearm in the water there. The firearm was observed to be a black Glock, Model 27, .40 caliber handgun, serial number WAL646. The handgun was loaded with a round in the chamber and approximately 14 rounds of ammunition in the magazine.

21. There were two cars in the driveway; both were rental cars. The first car was a white 2019 Chevrolet Colorado, MA registration 8CT996. The second car was a black 2018 Nissan Altima, bearing Georgia license plate CEL1139. Fontes indicated to law enforcement officers that Chevrolet Colorado was his rental vehicle and stated that the keys to the vehicle were located on the kitchen counter. Fontes refused to provide consent to search the vehicle.

22. Law enforcement officers secured the residence and coordinated with the United States Attorney's Office to acquire a search warrant for 13 Bay Drive, Canton, MA and a white Chevrolet Colorado, MA Registration 8CT996. At approximately 1:00 p.m., law enforcement officers executed the search warrant for 13 Bay Drive and the Chevrolet Colorado, MA 8CT996, that had been granted by this Court (18-MJ-1212-DLC).

23. During the search of 13 Bay Drive, officers seized the following items from the following locations:

---

[6] Lobo informed law enforcement officers that he lived in Fall River and was only staying at 13 Bay Drive as an overnight guest. Lobo directed law enforcement officers to a red piece of luggage in the living room that contained clothes and personal items. Lobo stated that it was his luggage. Lobo also stated that he used to live in Brockton, and presented law enforcement with his United States passport and cellphone number. Lobo was permitted to leave with his cellphone so that law enforcement could contact him using the number he had provided. Lobo also consented to a search of his black 2018 Nissan Altima, bearing Georgia license plate CEL1139, which was parked outside of 13 Bay Drive.

a) the aforementioned loaded Glock 27, .40 caliber handgun, serial number: WAL646, with one round in the chamber and an extended magazine containing approximately 14 rounds of ammunition (on kitchen counter—not in original location);

b) a loaded Glock 23, .40 caliber handgun with a teal-colored lower receiver, serial number: DDT799, with one round in the chamber, one magazine containing one round of ammunition and two empty magazines (in safe);

c) seven loose rounds of ammunition (in safe);

d) approximately $23,022 in United States currency ($10,963 on bed in upstairs front living room; $12,059 in safe);

e) a money counter (in lower kitchen cabinet);

f) four containers containing suspected marijuana, weighing over approximately 2,000 grams with evidence packaging (one on coffee table in living room; one in lower kitchen cabinet; one in upper kitchen cabinet; one in safe)

g) a scale with suspected drug residue (in upper kitchen cabinet);

h) various jewelry items (on kitchen counter; on nightstand in upstairs rear bedroom; on bed in upstairs front bedroom; on floor in closet of upstairs rear bedroom; in safe);

i) expensive clothing items (on floor in living room; on floor in upstairs front living room; on floor in upstairs rear bedroom);

j) miscellaneous paperwork in the name of Dylan Fontes (in safe);

k) Target Telephone 1 (on kitchen counter);

l) Target Telephone 2 (on kitchen counter);

m) Target Telephone 3 (on couch in living room);

n) Target Telephone 4 (in kitchen drawer);

o) Target Telephone 5 (on bed in upstairs front bedroom); and

p) Target Telephone 6 (on couch in living room).

**Drug Traffickers' Use of the Items Recovered Generally**

24. I believe, based on my training and experience investigating drug trafficking organizations and gangs, that the items recovered from 13 Bay Drive are consistent with and indicative of significant drug trafficking activity. I know, based on my training and experience, that drug trafficking is a cash business, and accordingly drug traffickers often possess large amounts of currency. Furthermore, I know, based on my training and experience, that drug traffickers use their profits to buy expensive jewelry and expensive clothing in order to launder their illegal profits. I also know, based on my training and experience, that drug traffickers often possess firearms to protect themselves, their drug supply, and their illegal profits. Drug traffickers are frequently targets of home invasions and robberies by other criminals who know that drug traffickers often possess large amounts of drugs, currency, and expensive jewelry and clothing. I know, based on my training and experience, that drug traffickers often possess scales in order to accurately weigh and sell their drugs, maximizing their profits.

25. While the investigators might already have all necessary authority to examine the equipment, I seek this additional warrant out of an abundance of caution to be certain that its search will comply with the Fourth Amendment and other applicable laws.

**Probable Cause to Believe that the Equipment Contains Evidence, Fruits, and Instrumentalities Related to the Violations of 18 U.S.C. §§922(g)(1) , 924(c) and 21 U.S.C. §§841(a)(1), 846**

26. Based upon my training and experience conducting investigations of drug trafficking organizations, I know that there are common practices employed by drug traffickers in the course of their illicit business. Specifically, drug traffickers commonly keep mobile telephones to be used to contact and receive correspondence from drug sources of supply, gun sources of supply, co-conspirators and associates, and drug customers. In the course of

conducting their business, drug traffickers are required to conduct their communications with the aforementioned subjects on multiple occasions on a daily basis. The correspondence that drug traffickers are required to maintain on their mobile telephone results in substantial evidence of drug trafficking activity being maintained in their telephone as it pertains to date, time, and duration of illegal drug-trafficking and gun-trafficking related communications. These communications often occur in a variety of ways, which include, but are not limited to text messaging (often used in lieu of phone calls to avoid speaking over the telephone), e-mails, "SnapChat" messaging, and Facebook messaging. Contents of these communications often denote locations, dates and times of prearranged meetings between sources of drug supply, sources of gun supply, co-conspirators and associates, and drug customers, drug types and amounts, and prices agreed upon. Moreover, telephone numbers and corresponding identities are often stored in drug trafficker's mobile telephone to facilitate these routine communications.

27. I have also found, based on my training and experience, that individuals who illegally possess or sell firearms often use their mobile phones to communicate and further gun trafficking activities. These individuals commonly take photographs of illegal firearms and ammunition with mobile phones to use for a variety of purposes including, but not limited to: sharing the photographs with potential buyers of firearms in order to solicit their interest in purchasing these items, posting photographs on social media sites to brag about the possession of these items to friends and associates, and sharing of the photographs with rival gang members or enemies for intimidation purposes.

28. In short, these communications result in records stored within the mobile phone which contain details of the mobile phone owner's drug trafficking activities. Based upon the

controlled purchase described above, I know that Fontes used his personal communication devices to discuss drug transactions.

29. Based on my training, experience, and information provided by other law enforcement officers, I know that many smartphones (which are included in Attachment B's definition of "hardware") can now function essentially as small computers. The equipment is various types of smartphones. Smartphones have capabilities that include serving as a wireless telephone, digital camera, portable media player, GPS navigation device, sending and receiving text messages and e-mails, and storing a vast range and amount of electronic data. Examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

30. From my training, experience, and information provided to me by other agents, I am aware that drug dealers—such as Fontes—commonly store records of the type described in Attachment B in mobile phones, computer hardware, computer software, and storage media.

31. Throughout this investigation, Fontes has used a cellular telephone to communicate to drug customers, sources of drug supply, and drug co-conspirators. Based on my knowledge, training, experience, and information provided to me by other agents, I know that data can often be recovered months or even years after it has been written, downloaded, saved, deleted, or viewed locally or over the Internet. This is true because:

a) Electronic files that have been downloaded to a storage medium can be stored for years at little or no cost. Furthermore, when users replace their electronic equipment, they can easily transfer the data from their old device to a new one.

b) Even after files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a device, the data contained in the file often does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data, which might not occur for long periods of time. In addition, the device's operating system may also keep a record of

      deleted data in a "swap" or "recovery" file.

    c) Wholly apart from user-generated files, electronic storage media often contains electronic evidence of how the device has been used, what it has been used for, and who has used it. This evidence can take the form of operating system configurations, artifacts from operating system or application operation; file system data structures, and virtual memory "swap" or paging files.   It is technically possible to delete this information, but users typically do not erase or delete this evidence because special software is typically required for that task.

    d) Similarly, files that have been viewed over the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."   The browser often maintains a fixed amount of hard drive space devoted to these files, and the files are overwritten only as they are replaced with more recently viewed Internet pages or if a user takes steps to delete them.

    32.     As discussed above, the equipment is currently being stored by investigators at their facilities as described in Attachment A.   From my training and experience and the training and experience of law enforcement personnel who routinely handle this equipment, I understand that it has been stored in a manner in which its contents are, to the extent material to this investigation, in substantially the same state as they were when it first came into the investigators' possession.

## CONCLUSION

    33.     Based on the information described above, I have probable cause to believe that Dylan Fontes violated 18 U.S.C. §§922(g)(1), 924(c) and 21 U.S.C. §§841(a)(1), 846.

    34.     Based on the information described above, I also have probable cause to believe that the equipment described in Attachment A contains evidence, fruits, and instrumentalities relating to the commission of these crimes, as described in Attachment B.

Sworn to under the pains and penalties of perjury,

_____
TIMOTHY R. KENNY
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me this 18th day of September, 2018.

_____
HON. DONALD L. CABELL
UNITED STATES MAGISTRATE JUDGE

